UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARIA LANE**,                                             Case No. 1:14 CV 2803
**ON BEHALF OF D.C.**,

       Plaintiff,                              Magistrate Judge James R. Knepp, II

      v.                                           MEMORANDUM OPINION AND
                                                     ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.

## INTRODUCTION

Plaintiff Maria Lane ("Plaintiff"), on behalf of her minor child D.C., appeals the administrative denial of child supplemental security income ("SSI"). The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

## PROCEDURAL BACKGROUND

Plaintiff filed D.C.'s application for SSI on December 16, 2011, alleging a disability onset date of November 1, 2011. (Tr. 122). Her application was denied initially (Tr. 55-63) and on reconsideration (Tr. 65-73). Plaintiff, represented by counsel, requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 93). Plaintiff testified at the hearing on April 29, 2013, after which the ALJ found D.C. not disabled. (*See* Tr. 10-24, 28-53). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On December 21, 2014, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

*Hearing Testimony*

D.C. was in the fifth grade at the time of the hearing and lived with his mother and siblings. (Tr. 32, 34). She testified D.C. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). (Tr. 33). She reported D.C. did not get along well with his siblings, constantly hit them, called them names, and used inappropriate language. (Tr. 34). She also reported he needed multiple promptings before he would perform chores, do school work, or complete his personal hygiene. (Tr. 34, 37-38).

D.C. was taking Intuniv and Adderall; the medications created "a big difference" in his behavior, although he still had outbursts and needed promptings. (Tr. 35-36). D.C. was in regular classes at school but he also had a 504 education plan. (Tr. 36). Plaintiff stated D.C.'s grades were "exceptional" and he was only struggling in math. (Tr. 38). She also stated that she got a daily report regarding D.C.'s behavior at school, which often included outbursts and being argumentative, but she admitted he was doing "a lot better". (Tr. 39). Plaintiff testified D.C. had a couple of friends that he socialized with at school and sometimes on the weekends but he could not get along with them for extended periods. (Tr. 40, 42, 46). She reported D.C. liked to play X-box, football, and basketball. (Tr. 41, 43).

Plaintiff stated D.C. had been in four schools between August 2011 and August 2012 because of his behavioral issues. (Tr. 43-44). D.C. had been suspended for three days in May 2012, but he had not had any suspensions since then; however, when behavioral incidents occurred he was removed from class. (Tr. 44).

2

Plaintiff testified she was in the process of finding a new doctor for D.C. and that was why the medical record was so scarce in the months leading up to the hearing. (Tr. 46). She also testified D.C. ceased counseling in 2011 because it was not successful. (Tr. 48-49).

*Function Reports*

On December 16, 2011, Plaintiff completed a function report regarding D.C. where she stated he was capable of making new friends, getting along with her and other adults, and playing team sports; but she noted his difficulty getting along with teachers. (Tr. 147). She reported D.C. could dress and feed himself, and perform personal hygiene requirements; but did not do as he was told or accept criticism. (Tr. 148). Plaintiff also reported an inability to finish tasks, including homework and chores; however, she stated "when [D.C.] is on his meds he is fine." (Tr. 149).

A month later, Plaintiff completed a second report where she reported hyperactivity, difficulty getting along with siblings, and the need for constant redirection. (Tr. 162-63). Yet, she also stated D.C. completed his chores, needed minimum supervision, and could be left at home alone. (Tr. 162). Socially, she stated he had a couple of friends and was courteous, helpful, and well-mannered with family members and neighbors. (Tr. 162). She also reported D.C. could maintain attention on his favorite TV shows or books, and could remember the major plot points. (Tr. 163-64). Plaintiff stated D.C. had behavioral problems at school, mainly with fighting, disrespectful comments, and an inability to follow directions. (Tr. 163). Again, she noted improvement with medication. (Tr. 163).

In July 2012, Plaintiff indicated an increase in severity of D.C.'s symptoms, particularly an increase in his frustration levels, ease of distractibility, ease of irritation, and almost daily fighting, cursing, or throwing of objects. (Tr. 205-06).

*Education Records*

On February 6, 2011, Danielle Opalich, D.C.'s teacher who saw him every day for approximately three hours, completed a teacher questionnaire. (Tr. 131-38). She reported D.C. was functioning at the fourth grade level in reading, math, and written language. (Tr. 131). She noted no problems in acquiring and using information but reported slight problems in attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. 132-37). She commented that D.C. was social and talkative, which can be disruptive, had difficulty switching tasks prior to completion, did not like to be corrected for misbehavior, and had trouble handling frustration. (Tr. 133, 136). Ms. Opalich reported D.C.'s behavior was significantly improved with medication and his hyperactivity had decreased. (Tr. 134, 137). His report card indicated D.C. was capable of above-average grades, but his failure to complete assignments or comply with instructions resulted in sub-standard grades; although his performance was helped by medication. (Tr. 183-84, 246).

From August to November 2011, the record includes multiple disciplinary referrals, suspension notices, and reports of inappropriate behavior. (*See* Tr. 167-69, 170-73, 179, 185, 186, 193). Yet, D.C. was not suspended again until May 2012. (Tr. 213-14).

D.C. had a 504 education plan which allowed D.C. to move around during the day, utilized token reinforcement strategies to improve behavior, and attempted to break his behavioral patterns. (Tr. 256-60). In conjunction with the 504, D.C. underwent a battery of academic testing which revealed he had average verbal comprehension, perceptual reasoning, and memory; simply put, D.C. had an average IQ. (Tr. 262-64). He also fell in the average range on the behavioral test administered. (Tr. 265).

4

Further in November 2012, Regina White, D.C.'s teacher, observed D.C.'s academic performance to be at grade level except in the areas of writing paragraphs and essays, and applying math to real life. (Tr. 267-68). She also noted D.C.'s social and adaptive behavior was in average range. (Tr. 269-70). Ms. White stressed the importance of D.C.'s medication and the significant effect it had on his ability to learn. (Tr. 270).

In an undated report, Ms. White reported D.C. had a tendency to speak out of turn and engage in verbal altercations, did not respond to change well, and did not accept criticism well. (Tr. 249-50). However, she also reported that when on his medication and able to focus, D.C. could follow instructions, work independently, and understand and complete assignments. (Tr. 249).

*Relevant Medical Evidence*

D.C. began treating at the Center for Families and Children in June 2010 and was seen approximately once a week by Stefanie Stedmire-Walls, LISW. (Tr. 282). On initial evaluation, it was noted D.C. was hyper, oppositional, and had moderate to severe conflicts with family members. (Tr. 295-96). It was also reported D.C. had mild/moderate problems with concentration, impulsivity, and anger management; and further, moderate problems with aggressive and disruptive behaviors. (Tr. 299). On November 1, 2011, child psychiatrist Solomon Zaraa, D.O., diagnosed D.C. with ADHD-Combined Type. (Tr. 209). At further appointments at the Center for Families and Children, significant progress with medication was noted. (Tr. 302, 304).

On February 1, 2012, Ms. Stedmire-Walls opined D.C. easily took on the negative behaviors of others, this combined with his impulsivity, caused him to make poor decisions. (Tr. 282). She noted his short attention span, poor disciplinary record at school, inability to take

5

responsibility, poor organizational skills, and his frequently disruptive and aggressive behaviors. (Tr. 282). However, she stated there was "marked improvement" in D.C. since he had been medicated. (Tr. 284).

On October 23, 2012, child psychiatrist Solomon Zaraa, D.O., opined D.C. had a moderate limitation in caring for himself; a marked limitation in acquiring and using information and in attending and completing tasks; and an extreme limitation in interacting and relating with others. (Tr. 291-92). Dr. Zaraa noted medication side effects of loss of appetite and headaches. (Tr. 292). He also commented that D.C. continued to have difficulties at home and in some school subjects due to his diagnoses of ADHD and ODD. (Tr. 293).

*State Agency Reviewers*

On initial evaluation in February 2012, Kristen Haskins, Psy.D., opined D.C. had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for yourself. (Tr. 59-60). She noted D.C.'s average language skills, attention issues, improvement with medication, and ease of frustration as the basis for her opinion. (Tr. 59-60). On reconsideration in August 2012, Aracelis Rivera, Psy.D., opined D.C. had no limitation in acquiring and using information or interacting and relating with others; but concurred with Dr. Haskins that he had less than marked limitations in attending and completing tasks, and caring for yourself. (Tr. 69-70).

*ALJ Decision*

After the hearing, the ALJ rendered a decision and found D.C. was not disabled. (Tr. 16-24). She found D.C. had the severe impairments of ADHD and ODD, but they did not meet or medically equal a listed impairment. (Tr. 16). The ALJ further found D.C. had less than marked

6

limitations in attending and completing tasks, and caring for himself; and no limitation in any other functional domains. (Tr. 18-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

7

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). The six functionality domains are: (i) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

**DISCUSSION**

Plaintiff argues the ALJ erred by (1) finding D.C. did not have marked impairments in two functional domains such that his impairments functionally met the listing; and (2) inappropriately weighing the opinion of Dr. Zaraa. (Doc. 16). The Court will begin by addressing the weight of the medical opinion and proceed into an analysis of the evidence supporting the functional domain determinations.

*Treating Physician*

Plaintiff argues by failing to give good reasons for the diminished weight accorded to the opinion of Dr. Zaraa, the ALJ created reversible error. (Doc. 16, at 11). Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. But treating physician status is only established when a plaintiff can demonstrate an ongoing treatment relationship with the doctor. An ongoing treatment relationship exists when "medical evidence establishes that [D.C.] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502.

Plaintiff would have this Court treat Dr. Zaraa's opinion as that of treating physician simply because he possesses a medical degree; but, that is an incorrect analysis. The record provided reveals that D.C. only saw Dr. Zaraa two times in the course of a year. (Tr. 209, 291). This brief and intermittent relationship is not sufficient to create a "longitudinal picture of [D.C.'s] medical impairments" which would warrant deference. *Rogers*, 486 F.3d at 242; *see e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[T]he assumption that the opinion of a treating physician warrant greater credit than the opinions of [others] may make scant sense when, for example, the relationship between the claimant and the treating physician

9

has been of short duration."); *Helm v Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011) (stating that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source . . ."); *Yamin v. Comm'r of Soc. Sec.,* 67 F. App'x 883, 885 (6th Cir. 2003). The treating physician rule is intended to grant deference to those medical sources that have a detailed and complete picture of the plaintiff's medical history; that rationale does not apply to Dr. Zaraa.

Although Dr. Zaraa is not a treating physician, the ALJ is still required to determine the weight afforded to his opinion. §§ 416.902, 416.927. The factors for determining the weight of a non-treating source opinion are the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source. *Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ also considers any fact "which tend[s] to support or contradict the opinion." § 404.1527(c).

The ALJ accorded some weight to the opinion of Dr. Zaraa but discounted his more extreme limitations because they were "not supported by the objective evidence in the record" and medication improved D.C.'s behavior. (Tr. 24). The basis of Plaintiff's argument is that the ALJ's conclusory statement regarding objective evidence is inadequate to discount Dr. Zaraa's opinion without citation to specific evidence. *See e.g., Friend v. Comm'r of Soc. Sec.,* 375 F.App'x 543, 551-52 (6th Cir. 2010); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio). Putting aside that these citations apply to a treating physician and the heightened articulation requirement attendant with that; the ALJ's explanation, though brief, is sufficient to explain why he did not afford greater weight to Dr. Zaraa.

10

In this case, it would be hard to ask the ALJ to perform an in-depth analysis of the basis of Dr. Zaraa's opinion, the reason being that there is hardly any record of Dr. Zaraa's treating D.C. Dr. Zaraa's name appears on only two documents within the entire record, neither of which are medical records. (Tr. 209, 291). More importantly, these records do not contain any details regarding Dr. Zaraa's treatment course or any mental status observations of D.C. (Tr. 209, 291). At most, medication management notes reveal D.C. was responding well to medication, which supports the ALJ's conclusion. (Tr. 24, 302, 304). Furthermore, objective evidence in the record does not support Dr. Zaraa's marked limitation in acquiring and using information. For example, D.C.'s grades, intelligence tests, reports of his teachers, and Plaintiff's testimony, all indicate D.C. is of average intelligence and capable of adequate performance in academics. (*See* Tr. 38, 163-64, 183-84, 246, 262-64, 267-68). Even more evidence supports the benefits of medication on D.C.'s behavioral and social problems. (*See* Tr. 35-36, 39, 40, 42, 46, 147, 149, 162-63, 249, 270, 284, 302, 304). In reviewing the opinion submitted by Dr. Zaraa, it provides no explanation for the restrictions opined nor does he reference any medical records to support his limitations. (Tr. 290-93).

Where, as here, the physician did not provide explanations for the restrictions, the regulations instruct a reduction in weight may be appropriate. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *see also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (conclusory statements from physicians, without support from specific documents, are a valid reason for discounting an opinion). Dr. Zaraa's checkbox opinion, submitted without explanation or reference to the

11

record, signals unreliability; therefore, the ALJ properly diminished the opinion's weight.

*Functional Domains*

Plaintiff's remaining argument focuses on the ALJ's determination that D.C. had less than marked limitations in the area of attending and completing tasks and no limitation in interacting and relating with others. (Doc. 16, at 6-10). At step three, an ALJ must provide "sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006)). But, the court may look to the ALJ's decision in its entirety to justify the ALJ's step three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 Fed. App'x at 411). When assessing functional limitations at step three, the ALJ considers myriad relevant factors, including the effects of medication and treatment. 20 C.F.R. § 416.924a(b)(9); *see also* §§ 416.924a, 416.924b, 416.929. The regulations direct the ALJ to examine the information in the child's record about how his functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings. § 416.926a(b).

Plaintiff argues in support of marked limitations in both domains that the ALJ failed to take into account the relevant opinions of Ms. Stedmire-Walls, Dr. Zaraa, Ms. White, and D.C.'s disciplinary and academic record; and instead, improperly relied on the opinion of Ms. Opalich which was rendered before the disability onset date. (Doc. 16, at 7-9). Preliminarily, it bears repeating that the applicable standard of review holds that even if substantial evidence supports a finding contrary to the ALJ's, this Court still cannot reverse so long as substantial evidence also supports the conclusion reached by the ALJ. *See Jones*, 336 F.3d at 477. Thus, the Court will

undertake an analysis of whether the ALJ had substantial evidence to support his conclusions on D.C.'s functional limitations.

In support of her conclusion that D.C. had less than marked limitation in attending and completing tasks, the ALJ relied heavily on the February 2011 opinion of D.C.'s teacher, Ms. Opalich. (Tr. 19). Ms. Opalich opined D.C. only had slight problems in some areas of attending and completing tasks; such as, carrying out multi-step instructions, refocusing to a task, and changing from one activity to another without being disruptive. (Tr. 19, 131-38). Ms. Opalich's opinion addresses the relevant functional domains and specifically states the daily activities where D.C. is limited; thus, the ALJ's reliance on a well-explained opinion from a source with regular contact with D.C. is not improper. Plaintiff believes the ALJ's reliance on this opinion was misplaced because it was given before the disability onset date. However, an ALJ is free to consider all the evidence in the record as long as she considers both pre and post-onset date evidence in her determination. *See Puterbaugh v. Colvin*, 2013 WL 3989581, at *15 (S.D. Ohio) ("The Court is unaware of, and Plaintiff has not cited to, any rule, regulation, or case prohibiting an ALJ from considering evidence in the record simply because it is from prior to an alleged disability onset date."); *see also Sparks v. Comm. of Soc. Sec.,* 2015 WL 5210463, at *12 (E.D. Mich.).

In reviewing the entire opinion, it is clear the ALJ reviewed evidence from both before and after the alleged onset date. (Tr. 18-24). First, in the same section where the ALJ cited to Ms. Opalich's opinion she also referred to the opinion of Ms. Stedmire-Walls; a clear indication that she reviewed and considered post-onset date evidence. Simply because the ALJ did not accord more weight to Ms. Stedmire-Walls' opinion, as Plaintiff would like, is not sufficient to overturn her determination. Second, the remainder of the decision includes citation to D.C.'s education

13

records, which prove he is capable of attaining average grades, and his significant improvement with medication; a combination of pre and post-onset evidence. (*See* Tr. 18-24, 35-36, 39, 40, 42, 46, 147, 149, 162-63, 246, 249, 270, 284, 302, 304). Third, Ms. Opalich's opinion is consistent with other reports in the record from after the onset date that finds D.C.'s behavioral issues are not overly limiting, especially with medication. (*See* Tr. 265, 269-70). Considering the evidence of record, the ALJ had substantial evidence to support her determination that D.C. had less than a marked limitation in attending and completing tasks.

As to interacting and relating with others, the ALJ found D.C. had no limitation because his behavioral issues were significantly improved by medication. (Tr. 20). Again, Plaintiff posited that the opinions of Ms. White, Ms. Stedmire-Walls, and Dr. Zaraa should have controlled any determination in this domain. However, the central factor in determining that D.C. was not limited in this area, i.e. his improvement with medication, was reflected by each of these individuals in their opinions. (*See* Tr. 249, 270, 284). Considering the ALJ had discounted Dr. Zaraa's and Ms. Stedmire-Walls' opinions, as unsupported and overly restrictive, it is reasonable for her not to rely on their determinations in making her findings. While it is certainly true that D.C. still suffered from behavioral problems, (Tr. 249, 282); none of the evidence cited by Plaintiff supports a finding that he was so limited as to render him disabled.

Despite the admitted paucity of the ALJ's explanations, sufficient evidence exists in the record to find D.C. does not have a marked limitation in these domains; such that, even if the ALJ had erred, it would be harmless. *See McIntosh ex rel. TLA v. Comm'r of Soc. Sec.,* 2012 WL 6966654, at *11 (E.D. Mich). Outside of the evidence discussed above and included in the ALJ's opinion, the record demonstrates that D.C. is capable of recalling information, maintaining friendships, acting appropriately with adults, and has not been suspended since May 2012. (*See*

14

Tr. 40, 46, 147, 162-64, 213-14). Undoubtedly, evidence remains that D.C. still has behavioral problems; however, his limitations are not disabling and appear to be improving. In this case there is no reason to believe that on remand the ALJ's decision would be any different; and thus, "remand would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969).

The ALJ reasonably articulated the reasoning and evidence that supported her determinations in both functional domains at issue; therefore, she did not err.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Commissioner's decision denying benefits is affirmed.

IT IS SO ORDERED.

                                                               s/James R. Knepp, II
                                                              United States Magistrate